**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MEGAN E. VICINO,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO.  JKB-12-2790** |
| **STATE OF MARYLAND,** | * | |
| **DEPARTMENT OF NATURAL** | | |
| **RESOURCES, et al.** | * | |
| **Defendants** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM AND ORDER

Megan E. Vicino ("Plaintiff") brought this suit against the Maryland Department of Natural Resources ("DNR") alleging employment discrimination on the basis of sex and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.  *See* 42 U.S.C. §§ 2000e *et seq.*  Plaintiff also brought this suit against her former supervisor David Powell ("Powell") to recover damages stemming from his alleged employment discrimination on the basis of sex.  *See* 42 U.S.C. § 1983.  Now pending before the Court is Defendants' motion for summary judgment.  (ECF No. 21.)  The Court has considered the motion, Plaintiff's response in opposition (ECF No. 23), and Defendants' reply thereto (ECF No. 24).  No hearing is required, Local Rule 105.6 (D. Md. 2011).  The motion will be DENIED.

## I. *Factual Background*[1]

Plaintiff was hired by DNR to work as a probationary[2] park ranger at Seneca Creek State Park and began working on July 1, 2009. (Am. Compl. ECF No. 7, ¶ 8; Defs.' Mot. Summ. J., Ex. 2, Dep. Vicino 18:8—22:7, March 27, 2013, ECF No. 21-4.) Plaintiff's immediate supervisor at Seneca Creek was Sergeant David Powell, the assistant park manager, who reported to Kim Lloyd, the Park Manager. (*Id.* Ex. 2, Dep. Vicino 22:4-9.) Within the hierarchical structure of DNR, Ms. Lloyd reported to the Regional Manager, Daryl Anthony, who reported to the Deputy Superintendent, Lieutenant Colonel Christopher Bushman, who reported to the Superintendent, Nita Settina. Ms. Settina is the DNR official who formally hired Plaintiff and who possessed the formal decisionmaking authority to terminate Plaintiff. (*Id.* Ex. 4, Dep. Settina 7:15—8:8, 31:11-13, Feb. 27, 2013, ECF No. 21-6.)

At the time of her hire, Plaintiff was the second of two full-time rangers assigned to Seneca Creek, the other being Ranger Chris Czarra. (*Id.* Ex. 1, Dep. Powell 12:20—13:3, March 26, 2013, ECF No. 21-3.) Plaintiff and Ranger Czarra were assigned to the same office, but they were not, however, assigned identical workspaces. Ranger Czarra's work station included a large L-shaped desk with two overhead storage areas and a file cabinet. (Pl.'s Opp'n, Ex. 3, Dep. Linnemann 17:9-15, Feb. 26, 2013, ECF No. 23-5.) Plaintiff's work station consisted of a corner computer cabinet with no storage or drawer space. (*Id.* Dep. Linnemann 19:16-19.) Only after Plaintiff requested improvements to her work space did Sgt. Powell grant her use of two drawers in a file cabinet ordinarily reserved for volunteer rangers. (*Id.* Ex. 1, Dep.

---

[1] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing the motion for summary judgment, Plaintiff. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

[2] DNR policy requires all new park rangers to undergo a one-year probationary evaluation period, at the end of which, DNR decides whether or not to retain each ranger as a classified employee. (Defs.' Mot. Summ. J., Ex. 4, Dep. Settina 7:7-14, Feb. 27, 2013, ECF No. 21-6.)

Powell 80:14—81:4; *Id.* Ex. 11, Decl. Vicino ¶ 3, ECF No. 23-13.)  Without any notice to Plaintiff, however, Sgt. Powell later removed the drawers he had given to Plaintiff because he did not want to "ruffle feathers" with the volunteer rangers.  (*Id.* Ex. 1, Dep. Powell 81:2-4.)

Plaintiff's initial responsibilities as a ranger included managing the daily operations of the park, overseeing seasonal rangers, checking people in and out of the rental pavilion, and directing traffic.  (*Id.* Ex. 2, Dep. Vicino 24:12-18.)  In October 2009, Sgt. Powell divided the responsibilities of hiring and supervising the park's seasonal staff between Plaintiff and Ranger Czarra.  (Defs.' Mot. Summ. J., Ex. 9, Powell Mem., ECF No. 21-11.)  Plaintiff was also put in charge of recruiting and maintaining contact with park volunteers.  (*Id.*)

Both Sgt. Powell and Plaintiff found it difficult to communicate with each other.  Sgt. Powell stated that there was a "trend" in conversations with Plaintiff such that it was often difficult getting information from her.  (Pl.'s Opp'n, Ex. 1, Dep. Powell 49:18—50:5.)  Conversely, Plaintiff notes that several female park employees agree that Sgt. Powell does not communicate well with female subordinates and cannot develop the same level of camaraderie with women that he has with male counterparts.  (*Id.* Ex. 3, Dep. Linnemann 39:19—40-10; *Id.* Ex. 18, Dep. Diep 17:17-22, Mar. 1, 2013, ECF No. 23-20; *Id.* Ex. 2, Dep. Vicino 119:11—120:7.)  Plaintiff notes further that when she asked Sgt. Powell questions he would not give her direct answers and often answered her with a question or would give contradicting information.  (*Id.* Ex. 2, Dep. Vicino 119:11—121:6.)  When Ranger Czarra would ask Sgt. Powell questions, Sgt. Powell would give Ranger Czarra direct answers.  (*Id.* Dep. Vicino 120:4—121:6.)  Sgt. Powell also frequently rejected Plaintiff's suggestions relating to recruiting volunteers without providing explanation or any instruction.  (*Id.* Dep. Vicino 63:11—64:12.)

Beginning October 19, 2009, Plaintiff and Ranger Czarra attended ranger school. (*Id.* Dep. Vicino 34:3-6.) Plaintiff received passing scores in all respects, although there were two incidents at ranger school reflecting negatively upon Plaintiff. (*Id.* Ex. 13, Ranger School Scores, ECF No. 23-15.) In the first incident, Plaintiff hurt her ankle while walking in the dark without a flashlight. (*Id.* Ex. 2, Dep. Vicino 35:19—36:10.) When Plaintiff was asked to make an incident report regarding the injury, the facts in her report did not match her original story. (*Id.* Ex. 10, Dep. Lloyd 53:17—54:3.) Plaintiff originally reported that she did not have a flash light when she fell and hurt her ankle, however, in her written report Plaintiff stated that she did have her flashlight but was merely not shining it at her feet. (*Id.* Ex. 28, DNR 689, ECF No. 23-30.) In the second incident, Plaintiff discovered that Ranger Czarra left a set of keys in the door of an unattended truck. (Defs.' Mot. Summ. J., Ex. 6, Dep. Lloyd 67:12-18.) Plaintiff reported the issue to the ranger school deans rather than to Ranger Czarra, whereupon, the deans took the opportunity to simulate the theft and vandalism of a DNR vehicle. (*Id.* Dep. Lloyd 68:4-18.) Following the incident, however, the deans informed Plaintiff that her initial response should have been to return the keys to Ranger Czarra and her actions had not reflected the teamwork expected among park rangers. (*Id.* Dep. Lloyd 68:19—70:8; *Id.* Ex. 4, Dep. Settina 13:1-9.) Ranger school dean Angie Hummer reported these incidents to Ms. Lloyd. (*Id.* Ex. 6, Dep. Lloyd 53:9—54:10, 66:10—67:11.) Ms. Lloyd later discussed the two incidents with Colonel Bushman and Ms. Settina while driving together from the ranger school graduation ceremony. (*Id.* Ex. 4, Dep. Settina 9:9-19.) Both Bushman and Settina expressed concern about Plaintiff based on these incidents and Ms. Settina even inquired as to whether they should consider termination at that point. (*Id.* Dep. Settina 15:12-21; *Id.* Ex. 5, Dep. Bushman 30:7-15, Feb. 27,

2013, ECF No. 21-7.) Ms. Lloyd, however, advised that they should give Plaintiff the opportunity to return to Seneca Creek. (*Id.* Ex. 4, Dep. Settina 15:12-21.)

When Plaintiff returned from ranger school, she met with Sgt. Powell and Ms. Lloyd. At that meeting Sgt. Powell and Ms. Lloyd expressed that Plaintiff was not meeting expectations with regard to recruiting volunteers and she needed to improve her efforts to bring in more volunteers. (Pl.'s Opp'n, Ex. 2, Dep. Vicino 63:1—64-12.) In December, Plaintiff again met with Sgt. Powell and Ms. Lloyd, this time for her mid-cycle evaluation. (*Id.* Dep. Vicino 66:11—67:4.) Once again, Plaintiff was told that she needed to increase her efforts with respect to recruiting and maintaining contact with volunteers. (*Id.* Dep. Vicino 69:3—71:19.) Plaintiff received an overall rating of "meets standards" in her mid-cycle evaluation.[3] (Defs.' Mot. Summ. J., Ex. 16, Vicino Evaluation 3, ECF No 21-18.)

Part of Plaintiff's duties included supervising boat center and concession seasonal employees, but Plaintiff also interacted with and assisted other seasonal employees, such as contact station employee Hadona Diep.[4] (*Id.* Ex. 9, Powell Mem. 2; Pl.'s Opp'n, Ex. 2, Dep. Vicino 153:3—155:2.) On April 27, 2010, Ms. Diep reported to Plaintiff that she felt she was being sexually harassed by Sgt. Powell. (*Id.* Dep. Vicino 156:22—157:10.) Prior to Ms. Diep's mid-April start date at Seneca Creek, she had two issues involving Sgt. Powell. There was a scheduling mistake relating to Ms. Diep's first weekend of work and an issue with the raise Ms. Diep was entitled to as a returning seasonal employee. (*Id.* Ex. 18, Dep. Diep 16:16—17:9.) Sgt.

---

[3] Plaintiff received a numerical score of 1.95, falling within the "meets standards" range of 1.75-2.74. (Defs.' Mot. Summ. J., Ex. 16, Vicino Evaluation 3, ECF No. 21-18.)

[4] Plaintiff recruited Ms. Diep to return to Seneca Creek for a second summer to work at the park's boat center. (Pl.'s Opp'n, Ex. 18, Dep. Diep 13:2-8.) Ms. Diep was reassigned, however, to the park's contact station because Sgt. Powell and Ms. Lloyd shared the belief that young females could handle the "close confines" of the contact station better than male employees. (*Id.* Ex. 1, Dep. Powell 99:9—100:6; *Id.* Ex. 10, Dep. Lloyd 105:12-20.) A male employee, Johnell Brunson, was reassigned from the contact station to take Ms. Diep's position at the boat center. (*Id.* Dep. Lloyd 104:19—105:8.) The record before the Court does not precisely define what the contact station is, however, for purposes of this motion the Court presumes that the contact station is a small building located at the park's entrance where park employees interact with patrons as they enter the park.

Powell corrected both of these issues, although he started repeatedly making comments to Ms. Diep such as "since you got a double raise you have to work double hard or harder" and since she had already taken a weekend off she was going to be his for the rest of the summer. (*Id.* Dep. Diep 35:2-5; *Id.* Ex. 2, Dep. Vicino 165:11-15.) Sgt. Powell would also stare at Ms. Diep for extended periods of time, to the point where Ms. Diep would feel uncomfortable. (*Id.* Ex. 18, Dep. Diep 39:7—40:5.) On April 27, Ms. Diep reported to Plaintiff that Sgt. Powell acted inappropriately around her and the other young female employees and Sgt. Powell's treatment of her had reached the point where she felt she was being sexually harassed by Sgt. Powell. (*Id.* Dep. Diep 18:12—19:21.)

On April 29, 2010, Plaintiff contacted Ms. Lloyd by email, stating "[w]hen you have a few minutes, I need to talk about something privately." (*Id.* Ex. 23, Vicino Email, ECF No. 23-25.) Later that same day, Plaintiff went to Ms. Lloyd's office to talk about Ms. Diep's complaint. (*Id.* Ex. 2, Dep. Vicino 165:16—166:4.) The parties disagree as to the actual subject matter of the April 29th conversation between Plaintiff and Ms. Lloyd. Plaintiff maintains that she informed Ms. Lloyd that Ms. Diep reported that she was being *sexually* harassed by Sgt. Powell. (*Id.* Dep. Vicino 165:20—167:19.) Ms. Lloyd, however, maintains that the conversation pertained to Sgt. Powell's harassment of Ms. Diep regarding the *scheduling* mistake that occurred several weeks prior. (Defs.' Mot. Summ. J., Ex. 6, Dep. Lloyd 118:4—119:10.)

On May 12, 2010, Ms. Lloyd attended a managers meeting with Ms. Settina. (*Id.* Dep. Lloyd 170:6-17; *Id.* Ex. 5, Dep. Bushman 25:5-19.) Ms. Lloyd reported that Plaintiff's performance was declining and that Plaintiff was unable to complete the tasks fundamental to the park ranger position. (*Id.* Ex 4, Dep. Settina 24:13—25:3.) Based upon Ms. Lloyd's recommendation, Ms. Settina agreed they should consider terminating Plaintiff on probation.

(*Id.* Ex. 6, Dep. Lloyd 170:6—171:4.) On May 18, 2010, Ms. Settina and Colonel Bushman discussed, via email, the possibility of terminating Plaintiff at the end of her probationary period. (Pl.'s Opp'n, Ex. 21, DNR 576, ECF No. 23-23.) Colonel Bushman was surprised that Ms. Lloyd recommended Plaintiff's termination to Ms. Settina. (*Id.*) Colonel Bushman had discussed Plaintiff with Ms. Lloyd on several occasions and although Ms. Lloyd expressed that Plaintiff had not developed into a "top-notch ranger," Ms. Lloyd also stated that she did not feel Plaintiff should be terminated on probation. (*Id.*) The two agreed to monitor the situation and take a "hard look" before making a decision regarding Plaintiff. (*Id.*)

On June 7, 2010, Plaintiff participated in her year-end evaluation with Ms. Lloyd and Sgt. Powell. (*Id.* Ex. 2, Dep. Vicino 107:6-17.) Plaintiff's rating on her end-cycle evaluation dropped from what it was at her mid-cycle evaluation into the "needs improvement" range.[5] (*Id.* Ex. 16, Vicino Evaluation 4, ECF No. 23-17.) Sgt. Powell prepared a report detailing his evaluation comments regarding Plaintiff. (*Id.* Ex. 22, Powell Evaluation Comments, ECF 21-4.) Plaintiff also prepared a written rebuttal to her evaluation and sent copies to Sgt. Powell and Ms. Lloyd. (*Id.* Ex. 24, Vicino Evaluation Rebuttal, ECF No. 21-25.) Following Plaintiff's rebuttal, a meeting was convened to discuss Plaintiff's employment future. (*Id.* Ex. 5, Dep. Bushman 52:13—53:18.) Ms. Lloyd, Major Anthony, and Colonel Bushman all attended this meeting. (*Id.* Dep. Bushman 51:16—52:12.) There is a factual dispute as to whether Ms. Settina attended the meeting. (*Id.* Dep. Bushman 52:16-19, 67:8-16.) During the meeting, Colonel Bushman asked Ms. Lloyd to prepare an additional performance rebuttal addressing Plaintiff's comments. (*Id.* Dep. Bushman 55:3—56:5; *Id.* Ex. 24, Lloyd Performance Rebuttal, ECF No. 21-26.) Colonel Bushman also requested that ranger school dean Angie Hummer prepare a report

---

[5] Plaintiff received a numerical score of 1.65, falling within the "needs improvement" range of 0.75-1.74. (Defs.' Mot. Summ. J., Ex. 16, Vicino Evaluation 4, ECF No. 21-18.)

detailing Plaintiff's incidents at ranger school. (*Id.* Ex. 5, Dep. Bushman 53:5-7.) All of the reports outlined above were presented to Ms. Settina and based on the reports and prior discussions with Ms. Lloyd and Colonel Bushman, Ms. Settina made the decision to terminate Plaintiff. (*Id.* Ex. 4, Dep. Settina 31:11—32:2.) On June 18, 2010, Plaintiff met with Ms. Lloyd and Major Anthony at which time Major Anthony gave Plaintiff the option to resign or be terminated. (*Id.* Ex. 2, Dep. Vicino 135:14-22.) On June 21, 2010, Plaintiff signed a letter of resignation. (*Id.* Dep. Vicino 138:14—139:10.) On June 22, 2010, Plaintiff filed an Internal Equal Employment Opportunity Complaint ("EEO Complaint"). (*Id.* Ex. 28, Internal EEO Complaint, ECF No. 21-30.)

Additional facts will be addressed later in the opinion.

## II.  Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir.

2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

## III. Analysis

### A. Sex-Based Discrimination – Counts One and Three

Counts One and Three, brought under Title VII (42 U.S.C. § 2000e *et seq.*) and 42 U.S.C. § 1983, respectively, are analyzed identically on their merits. Thus, where the focus is on sex-based discrimination with respect to the terms and conditions of employment, ultimately resulting in termination, evaluation of the evidence is the same regardless of whether the claim is brought under Title VII or under 42 U.S.C. § 1983. *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citing *Boutros v. Canton Regional Transit Auth.*, 997 F.2d 198, 202-03 (6th Cir. 1993); *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990)).

Title VII makes it "an unlawful employment practice for an employer … to discharge … or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's … sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). A plaintiff may avert summary judgment and establish a claim of sex based discrimination through two avenues of proof. First, a plaintiff may demonstrate, through direct or circumstantial evidence, that discrimination motivated the employer's adverse employment decision. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). Plaintiffs are not required, however, to demonstrate that the prohibited characteristic was the sole motivating factor. *Id.* Title VII provides that an "unlawful

employment practice is established when a complaining party demonstrates that … sex … was a *motivating factor* for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m) (emphasis added). Accordingly, a plaintiff demonstrates a "mixed-motive" discrimination claim, through direct or circumstantial evidence, by showing that the employer's adverse employment action was motivated by both permissible and discriminatory reasons. *Id.*; *Hill*, 354 F.3d at 284. However, an employer may effectively limit the remedies available to an employee where the employer can show it would have made the same decision in the absence of the discriminatory motivation. *Hill*, 354 F.3d at 284. "On a claim in which an individual proves a violation under § 2000e-2(m)" and the employer "demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court … may grant declaratory relief, injunctive relief, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under § 2000e-2(m)" and "*shall not* award damages or issue an order requiring any admission, reinstatement, hiring, promotion or payment." 42 U.S.C. § 2000e-5(g)(2)(B) (emphasis added).

Alternatively, a plaintiff may proceed by establishing a prima facie case of discrimination under the *McDonnell Douglas* "pretext" framework. *Hill*, 354 F.3d at 285 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 798, 807 (1973)). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case by showing (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class. *Id.* If a prima facie case is made, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Id.* If the

employer meets this burden, the *McDonnell Douglas* framework and its presumptions disappear, and the "sole remaining issue is discrimination *vel non*." *Id.* (citations omitted). In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were in fact a pretext for discrimination. *Id.* A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is "unworthy of credence" or by offering circumstantial evidence sufficiently probative of the issue of discrimination. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). A plaintiff's burden to demonstrate pretext merges with the ultimate burden of demonstrating discrimination by a preponderance of the evidence. *Hill*, 354 F.3d at 285.

In the present case, Plaintiff's response in opposition argues that her supervisor's discriminatory animus towards her was the motivation behind her termination.[6] (Pl.'s Opp'n 29-30, ECF No. 23.) To demonstrate that discrimination motivated the adverse employment action, a complaining party must show that a protected trait, such as sex, actually played a role in the employer's decision making process and had a determinative influence on the outcome. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000). Title VII states that "[i]t shall be an unlawful employment practice for an *employer* … to discharge … or otherwise discriminate against any individual … because of such individual's sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Title VII further defines "employer" as "a person engaged in an industry affecting commerce … and any *agent* of such a person." 42 U.S.C. § 2000e(b) (emphasis added). Thus, agency principles guide courts when deciding whether or not to make an employer vicariously liable for the discriminatory acts and motivations of an employee. *Hill*, 354 F.3d at 287; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998). Under prior Fourth

---

[6] It is unclear from Plaintiff's response in opposition whether she is proceeding on a sole-motivation basis or a mixed-motive basis. However, that issue need not be resolved at the present stage; it may be addressed at trial.

Circuit precedent, the person allegedly acting pursuant to a discriminatory animus need not be the "formal decisionmaker" to attach liability to an employer for an adverse employment action, so long as the plaintiff demonstrates that the subordinate was the one "principally responsible" or the "actual decisionmaker" behind the action. *Hill*, 354 F.3d at 288 (citing *Reeves*, 530 U.S. at 151-52). In sum, the *Hill* opinion held that Title VII does not allow a "biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decision maker simply because he had a substantial influence on the ultimate decision or because he has played … even a significant [role] in the adverse employment decision." *Id.* at 291. A plaintiff must show "sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer." *Id.*

The Fourth Circuit's decision in *Hill*, however, does not end the analysis for claims that discrimination motivated an adverse employment action. The Supreme Court recently considered when an employer may be held liable for the discriminatory animus of an employee who influenced but did not make the ultimate employment decision. *See Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1189 (2011). In *Staub*, the Court found that federal torts, like the one included in the Uniformed Services Employment and Reemployment Rights Act ("USERRA"),[7] should be interpreted giving consideration to the background of general tort law. *Id.*

---

[7] The claim in *Staub* was brought under USERRA, which the Court acknowledged contained language very similar to that giving rise to causes of action for discrimination under Title VII. 131 S. Ct. at 1191. The Court compared § 4311(c) of USERRA, which states "[a]n employer shall be considered to have engaged in [a prohibited action] … if the person's membership [in the armed services] … was a *motivating factor* in the employer's action, *unless the employer can prove that the action would have been taken in the absence of such membership*," with §§ 2000e-2(a) & (m) of Title VII, which prohibit adverse employment actions "*because of*" race, color, religion, sex or national origin and actions where race, color, religion, sex or national origin was one of several *motivating factors*. *Id.* (emphasis added). Nothing in the *Staub* opinion, however, indicates that its analysis of the nexus between a subordinate's discriminatory animus and an employer's adverse employment action should be restricted to mixed-motive cases and made inapplicable to sole-motive cases.

Accordingly, the Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at 1194. The Court further clarified that "intent" requires that "the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id.* at 1194 n.3 (citing Restatement (Second) Torts § 8A). Similarly, proximate cause should be considered with regard to traditional tort principles, and requires "only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'links that are too remote, purely contingent, or indirect.'" *Id.* at 1192 (citations omitted).

The Fourth Circuit considered *Staub*, in *Young v. United Parcel Service*, and indicated approval of *Staub*'s application to the Title VII context. 707 F.3d 437, 449 (4th Cir. 2013). In *Young*, the Court analyzed whether discriminatory comments made by a division manager to Young constituted direct evidence of corporate animus toward pregnant women, but found no evidence that the division manager possessed sufficient authority to make decisions regarding Young's employment nor did he seek to influence the party who did. *Id.* In view of the Fourth Circuit's application of *Staub* to Title VII cases in *Young*, this Court finds that a complaining party may demonstrate that discrimination motivated an adverse employment action if (1) the individual with the discriminatory animus "possessed such authority as to be viewed as the one principally responsible for the [adverse employment] decision or the actual decisionmaker for the employer," under *Hill*; or (2) the subordinate with discriminatory animus *intended* to influence the person with decisionmaking authority and was a proximate cause of the ultimate adverse employment action, under *Staub*. *See id.*; *accord Ridgell v. Colvin*, Civ. No. DKC-10-3280, 2013 WL 952253, *12 (D. Md. Mar. 11, 2013).

In the instant case, Plaintiff has offered direct and circumstantial evidence of discriminatory animus resulting in her termination. She has also offered evidence that the Defendants' proffered reasons for her termination were pretextual, pursuant to the *McDonnell Douglas* burden-shifting framework. Seeing as Plaintiff may avert summary judgment under either of these theories, the Court finds that summary judgment is not appropriate as to Counts One and Three.

Genuine issues of material fact exist as to the animus, intent, and proximate cause elements of the *Staub* standard. First, viewing the facts *in the light most favorable to Plaintiff*, a reasonable jury could conclude that Sgt. Powell's conduct as Plaintiff's supervisor was motivated by a gender-based animus. Sgt. Powell made little to no preparations for Plaintiff's arrival as a ranger and assigned her a workstation that was clearly inferior to her male counterpart's. (Pl.'s Opp'n, Ex. 3, Dep. Linnemann 17:9-15, 19:16-19.) Sgt. Powell was reluctant to provide any guidance to Plaintiff, contrary to his treatment of the male ranger, and regularly rejected Plaintiff's suggestions without providing a basis or explanation. (*Id.* Ex. 2, Dep. Vicino 63:11—64:12.) Further, there is evidence that Sgt. Powell does not relate well to women and, in fact, DNR's Equal Opportunity Employment ("EEO") Officer, Richard Allen, has stated that Sgt. Powell is "no boy scout" and works for DNR "with arrogance" relating to his poor and "gruff" treatment of women. (*Id.* Ex. 3, Dep. Linnemann 39:19—40-10; *Id.* Ex. 7, Dep. Allen 34:2—35:9, Feb. 27, 2013, ECF No. 23-9.) Moreover, Sgt. Powell's evaluation comments, which primarily denigrated Plaintiff, might also be viewed as motivated by this same discriminatory animus.

Second, a reasonable jury could also conclude that Plaintiff's end-cycle evaluation and Sgt. Powell's evaluation comments were intended by Sgt. Powell to cause Plaintiff's termination.

Sgt. Powell's and Ms. Lloyd's end-cycle evaluation degraded Plaintiff's rating as a ranger from "meets standards" to "needs improvement." (*Id.* Ex. 15, Vicino Evaluation 2.)  Ms. Settina acknowledged that she is unaware of any ranger who was retained after receiving a "needs improvement" rating on an end-cycle evaluation. (Defs.' Mot. Summ. J., Ex. 4, Dep. Settina 41:1-22.)  It is a reasonable inference that Sgt. Powell sought to reinforce this low rating by providing evaluation comments that justified a score to precipitate Plaintiff's dismissal. Moreover, a reasonable jury might similarly find that Sgt. Powell's actions as Plaintiff's supervisor reflected his intent that Plaintiff ultimately leave Seneca Creek or be terminated altogether.

Finally, as to causation, there is also evidence supporting the notion that Sgt. Powell's discriminatory actions were a proximate cause of Plaintiff's termination.  It is unclear from the record what weight Ms. Settina gave Plaintiff's end-cycle evaluation and Sgt. Powell's evaluation comments when making her ultimate decision to terminate Plaintiff, but the facts do reflect that these reports were generated as part of the record supporting the decision to terminate Plaintiff.  (*Id.* Ex. 1, Dep. Powell 127:6-21.)  Plaintiff's primary contention, however, is that Sgt. Powell's discriminatory animus is reflected in his hostile training and supervision of Plaintiff and that many of the deficiencies that formed the basis of Plaintiff's termination were caused by Sgt. Powell.  Considering the evidence in the light most favorable to Plaintiff, a reasonable jury might find that some or all of the deficiencies considered by Ms. Settina were the result of Sgt. Powell's reticent training and supervision.  It is difficult to find evidence showing that Sgt. Powell gave Plaintiff clear or thoughtful guidance as a ranger.  Further, Ms. Settina acknowledged she was aware that a strained relationship existed between Plaintiff and Sgt. Powell prior to making her decision to terminate Plaintiff.  (*Id.* Ex. 4, Dep. Settina 31:6-10.)

Proximate cause only requires a "direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'links that are too remote, purely contingent, or indirect.'" *See Staub*, 131 S. Ct. at 1192. Ultimately, this Court is not convinced that as a matter of law Sgt. Powell's evaluation and conduct as Plaintiff's supervisor cannot be considered a causal factor in Ms. Settina's decision to terminate Plaintiff. Accordingly, the motion for summary judgment as to Counts One and Three shall be denied.

### B. Retaliation – Count Two

Count Two asserts that DNR violated Title VII when it terminated Plaintiff in retaliation for her reporting Sgt. Powell's sexual harassment of Hadona Diep. Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Claims of retaliation are governed by the same proof schemes applicable to Title VII discrimination claims, except that proof of retaliation requires but-for causation; the mixed-motive analysis is inapplicable to retaliation claims. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005); *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 650 (4th Cir. 2002). In *University of Texas Southwestern Medical Center v. Nassar*, the Supreme Court recently clarified that Title VII does not permit retaliation claims to be proved based on any showing other than but-for causation. 133 S. Ct. 2517, 2528 (2013) (finding no meaningful difference between the texts of the retaliation provision of Title VII and the Age Discrimination in Employment Act ("ADEA") and holding, therefore, that Title VII retaliation claims, like claims brought under ADEA, require but-for causation) (citing *Gross v. FBL Financial Services, Inc.*, 577 U.S. 167, 176 (2009)). Requiring but-for causation, however, is not to say that retaliation claims are only actionable if the employer's retaliatory

action was the "so-called 'ultimate employment decision." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal citation omitted).  Rather, claims of retaliation are actionable so long as "a reasonable employee would have found the challenged action materially adverse," meaning "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* at 67-68 (citations omitted).

Under the *McDonnell Douglas* methodology, a plaintiff may establish a prima facie case of retaliation by proving three elements: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) a causal connection existed between the protected activity and the asserted adverse action.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011); *Thompson*, 312 F.3d at 650.  If a prima facie case is shown, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action.  *Hoyle*, 650 F.3d at 337; *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005).  If the employer meets this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were in fact a pretext for retaliation.  *Hoyle*, 650 F.3d at 337.  A plaintiff meets the burden of demonstrating pretext by showing that the employer's proffered explanation is "unworthy of credence" or by offering circumstantial evidence sufficiently probative of the issue of retaliation.  *Price*, 380 F.3d at 212.

Here, as to the first element of a prima facie case, there is a factual dispute whether Plaintiff engaged in a protected activity when she spoke to Ms. Lloyd about Sgt. Powell's "harassment" of Hadona Diep.  Viewing the facts in the light most favorable to Plaintiff, the Court is satisfied that a reasonable jury could determine that Plaintiff discussed "sexual harassment" with Ms. Lloyd and thereby engaged in a protected activity.  Second, it is

undisputed that DNR took an adverse action against Plaintiff when it terminated her. Finally, there is a causal link between Plaintiff's protected activity and the adverse action. For purposes of demonstrating a prima facie case, a causal nexus exists where the employer takes the adverse action "shortly after learning of the protected activity." *Price*, 380 F.3d at 213. Here, Plaintiff was terminated less than two months after engaging in a protected activity with her employer. This short time interval satisfies the requisite causal link. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding a four-month period satisfied the causal nexus for a prima facie case of retaliation); s*ee also, e.g., Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 588-89 (D. Md. 2012) (finding a two-month interval sufficed to show the "little proof" required to establish causation for a prima facie case of retaliation); *Kline v. Certainteed Corp.*, 205 F. Supp. 2d 468, 474-75 (D. Md. 2002) (finding a plaintiff established the causal element of a prima facie case where she had been terminated within two months of filing EEOC charges). Accordingly, the Court will assume that Plaintiff has established the causal element of a prima facie case.[8]

DNR has rebutted Plaintiff's prima facie case of retaliation by presenting evidence that Plaintiff was terminated for legitimate non-retaliatory reasons. DNR points to Plaintiff's mid-cycle and end-cycle evaluation, indicating that Plaintiff failed to appropriately prioritize work and complete assignments accurately and on time, Plaintiff did not keep commitments and follow up with customer requests, and Plaintiff failed to exercise appropriate judgment. (Defs.' Mot. Summ. J., Ex. 16, Vicino Evaluation 2.) Further, DNR points to reports created by Ms.

---

[8] DNR's motion argues the causal element of a prima facie case is missing in this case because it is not clear from the evidence that Ms. Settina was aware of the protected activity, and therefore, could not have terminated Plaintiff in retaliation for that protected act. (Defs.' Mot. Summ. J. 31-33, ECF No. 21-1.) Plaintiff, however, has raised a factual dispute as to whether Ms. Settina attended a managers meeting where the alleged protected activity was discussed; in that same meeting Colonel Bushman even asked Ms. Lloyd to prepare a report providing additional clarification on the subject. (Pl.'s Opp'n, Ex. 22, Dep. Bushman 52:3-19, 67:8-16.) This factual dispute, alone, may not suffice to demonstrate pretext; it is sufficient, however, to satisfy the "little proof" required to show the causal element of a prima facie case. *See Dea v. Washington Suburban Sanitary Comission*, 11 F. App'x 352, 364 (4th Cir. 2001) (unpublished).

Lloyd, Sgt. Powell, and Angie Hummer that detail Plaintiff's deficiencies as a ranger, including poor judgment, teamwork, and communication skills. Accordingly, DNR has articulated a legitimate basis for the adverse employment action, and thus, Plaintiff bears the burden of demonstrating that DNR's stated reasons for termination are in fact pretext for retaliation.

Here, Plaintiff has raised circumstantial evidence probative of the issue of retaliation. *See Price*, 380 F.3d at 212. In late January, 2010, Ms. Lloyd emailed Plaintiff stating that while Plaintiff was lacking in the confidence needed for the job, Plaintiff was "still well within the learning curve." (Defs.' Mot. Summ. J., Ex. 18, DNR 178, ECF No. 21-20.) Further, Ms. Lloyd told Colonel Bushman on multiple occasions that Plaintiff was "much improved" and that she did not feel DNR needed to consider terminating Plaintiff on probation. (*Id.* Ex. 19, DNR 576, ECF No. 21-21.) The evidence suggests, however, an apparent change in Ms. Lloyd's opinion closely following Plaintiff's protected activity. The protected activity occurred on April 29, 2010. On May 12, 2010, less than two weeks after speaking with Plaintiff, Ms. Lloyd, for the first time, advocated to Ms. Settina that Plaintiff be terminated. (*Id.* Ex. 4, Dep Settina 24:10—25:3.) Moreover, Ms. Lloyd spoke a second time with Ms. Settina to reconcile the fact that Colonel Bushman had reported that his conversations with Ms. Lloyd indicated that Plaintiff should not be in danger of termination. (*Id.* Dep. Settina 25:4—26:9.) For a second time, Ms. Lloyd advocated to Ms. Settina that Plaintiff be terminated. (*Id.* Dep. Settina 26:14-21.) A managers meeting was also convened to consider Plaintiff's future with DNR, where again, Ms. Lloyd had a central role in the discussions. Plaintiff's alleged protected activity was discussed at this meeting and Colonel Bushman even asked Ms. Lloyd to prepare a report clarifying the issue. (*Id.* Ex. 5, Dep. Bushman 52:3-15.) Further, there is a factual dispute as to whether Ms. Settina was present for that discussion. (*Id.* Dep. Bushman 52:3-19, 67:8-16.) Ms. Settina has

acknowledged that she was aware that Plaintiff and Sgt. Powell had a strained relationship prior to making her decision to terminate Plaintiff. (*Id.* Ex. 4, Dep. Settina 31:6-10.)

It is also probative to the issue of pretext that many of the documents relevant to Plaintiff's termination were compiled after the protected activity. Plaintiff's end-cycle evaluation, Sgt. Powell's evaluation comments, Ms. Lloyd's performance rebuttal, and Angie Hummer's report explaining Plaintiff's incidents at ranger school were all generated within the two months following Plaintiff's protected activity but before her termination. Accordingly, criticisms in these documents that were not raised prior to the protected activity or that contradict statements made prior to the protected activity create a reasonable inference that they may have been manufactured as a pretext for dismissal.[9] Plaintiff's end-cycle evaluation scores dropped from "meets standards" to "needs improvement" in four separate categories, which dropped Plaintiff's overall end-cycle score into the "needs improvement" range. (Pl.'s Opp'n, Ex. 15, Vicino Evaluation 2.) In October 2009, Ms. Lloyd cautioned Ms. Settina against terminating Plaintiff based on the ranger school incidents because ranger school is a unique and stressful environment. (Defs.' Mot. Summ. J., Ex. 4. Dep. Settina 15:12-21.) In June 2010, however, Ms. Lloyd and Colonel Bushman asked Angie Hummer to prepare a report for Ms. Settina detailing Plaintiff's incidents at ranger school. (Pl.'s Opp'n, Ex. 22, Dep. Bushman 52:20—53:7.) Ms. Lloyd even asked Ms. Hummer to edit her original report to reflect the appropriate level of counseling the two incidents required. (*Id.* Ex. 28, DNR 689, ECF No. 23-30; *Id.* Ex. 30, DNR 177, ECF No. 23-32.)

---

[9] *Cf. Jyachosky v. Winter*, 343 F. App'x 871, 876 (4th Cir. 2009) (unpublished) (per curiam) (finding that documents created contemporaneously with the plaintiff's problems as an employee demonstrate that the problems were not manufactured after her dismissal to serve as pretext); *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 590 (D. Md. 2012) (finding criticisms that served as a basis for the plaintiff's dismissal did not raise an inference that they were manufactured as pretext for retaliation where those criticisms were made prior to the protected activity).

Ultimately, Plaintiff's retaliation claim may well lose before a jury. The evidence indicates that Plaintiff was never considered a "top notch" ranger and many of her deficiencies, including managing volunteers and prioritizing her workload, persisted throughout her entire term as a probationary ranger. However, the evidence has generated a factual record sufficient (barely) to permit a reasonable jury to conclude that, but for Plaintiff's protected activity, Ms. Lloyd would not have taken steps to advocate for Plaintiff's dismissal and some or all of the reports generated as a record supporting Plaintiff's termination would have differed. While Plaintiff's evidence is largely circumstantial, it is sufficient to generate a jury question as to pretext, and accordingly, summary judgment is not appropriate on this claim.

## IV. Conclusion

For the foregoing reasons, Defendant has not shown it is entitled to summary judgment. Accordingly, the motion (ECF No. 21) is DENIED.

DATED this <u>8th</u> day of November, 2013.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge